Health Alliance, case number 25100. You've lost your audience, okay. I thought they were here for me. Good morning. Good morning. May it please the court, my name is Patricia Finn. I represent Plaintiff Appellant Susan Heath. This case comes from the Southern District, Judge Rochon. We are here arguing that Judge Rochon's ruling granting the defendant's motion to dismiss was in error. The reason being is this case is not about a mere funding dispute of gain-of-function research. It is not about speculative liability or abstract policy. It is not about ascribing fault for the pandemic. This is about an individual named Henry Herz who was high risk for COVID infection and he died as a result of the virus allegedly created by Eco Health Alliance. I'll make four points this morning. Strict liability under Dundalakis v. Town of Hempstead. I would also argue precedent from Spano v. Perini Court which shows that modern mass tort cases that have an element of create and conceal typically survive a motion to dismiss. Judge Rochon in the lower court provided an enhanced standard for strict liability. She argued that we needed to show operational control, meaning that Eco Health was involved with the day-to-day operations at its various laboratories. But then we were denied any discovery, even discovery of evidence that the defendants had included in their motion to dismiss and their letter motion objecting to discovery. There was an objection to some limited discovery requests under New York State law, which is the substantive law that applies. We were entitled to insurance information. Insurance information. Was this not dismissed at the motion to dismiss stage? Yes, but under... So... Excuse me. No, go ahead. So under CBLR, insurance information is supposed to be disclosed early in the proceeding. Was this not in the federal court? Yes, but it's the substantive law that applies. Yes. It's the state law. In the first order of things, on a motion to dismiss, you've got to make allegations that raise a plausible influence for us to stay in play on negligence or strict liability. And that's what I thought was in front of us. It is. But the point I'm trying to make is that we never really had an opportunity, even minimal disclosure, regarding... No, no, no, no. But that is exactly the point of my question. My question is that everything, including as a matter of substantive New York law, but in federal court, everything is premised on your ability to... the complaint's ability to raise a stated claim based on plausible inferences. And we can't... As I understand it. Okay. So why don't you address that? So the complaint alleged that Ego Health Alliance was involved in the creation, the funding, the direction of the creation of the COVID-19 virus. When this case was filed, the information wasn't as clear as it is today, but those allegations were very specific. The complaint alleged negligence, that Ego Health Alliance owed a duty to Henry Hearst to prevent him from being infected. Ego Health Alliance had indicated specifically that they were targeting high-risk individuals like my client, Mr. Hearst. I understand that. I'm looking at what appears to be a seven-page complaint, and I'm struggling to find an allegation that Ego Health Alliance conducted research, other than they funded the lab, along with the NIH and the NIAID. I'm struggling to find an allegation in this complaint that they did anything other than provide some funding for the lab that is charged with all the wrongful conduct. Can you point to me in the complaint where you allege that they engaged in conduct? Not funding. I'm looking at specifically your paragraph 14 on page 4, and it's they negligently funded, funded monies. It's all about funding and not about direct conduct by them. Your Honor, at this point, when this complaint was filed, the allegation, if you look at 14B, it says, Ego Health Alliance knew or should have known that there existed serious biosafety problems at the WIV. They should have known there was no oversight at the laboratory, that it was a BSL-2 letter. And, therefore, because they should have known that, they shouldn't have funded this research. Is that correct? Yes, that is correct. And the funding in and of itself was a sufficient force that set forth the injury that was suffered by the plaintiff. The fact that they were funding both public, using both public and private money to create a virus that injured the plaintiff was sufficient grounds to apply strict liability. Can I ask you what the limiting principle for your strict liability theory is? What's the line at which funding scientific research becomes abnormally dangerous? And, obviously, you saw the amicus brief. Yes, and I hope that we can get judicial notice, not only of the amicus brief, but of the executive order of President Trump nixing all gain-of-function research. That goes directly to the policy determination. Well, what is the limiting principle? So Judge Reshan, as well as — well, let me just say. Judge Reshan indicated the possibility that if liability was found here, there would be a watershed of liability, that it would result in unlimited claims and cases. What is the limiting principle? The limiting principle is found in the restatement that lists six categories which have to be satisfied in order for strict liability to apply. And that is the limiting principle. What Judge Reshan is doing is she's applying affirmative defenses, policy defenses directed at limitless liability to a standard on a motion to dismiss, that it's only supposed to be evaluating the sufficiency of the pleadings. And the pleadings are sufficient. It's a notice pleading. They provided funding that resulted in the harm to plaintiff first. And the harm is there's two theories of liability. Strict liability applies with the limiting factors of the restatement.  Let me ask you this. I guess I'm in the negligence section, right? Paragraph 14? Yes. How are B and C compatible? B says, at the time of the funding, EHA knew or should have known that there were serious biosafety problems at the lab. Right? And C says, EHA knew at the time, he had no oversight and no way of knowing how safe the labs were. How do you simultaneously allege that EHA had no way of knowing how safe it was or wasn't, and yet should have known how unsafe it was? How do you say there's no way of knowing, and yet you should have known it was unsafe, if you've just also said there's no way of knowing whether it's safe or unsafe? I understand. So reconcile those two. I can't contain both thoughts in my brain at the same time. Okay. So the theory here is bifurcated. We have strict liability. No, no. I'm only in 14B, which is your negligence section. We are not in strict liability. I'm reading 14B and C. They seem like they are mutually contradictory. Explain to me how 14B and C are mutually compatible in my brain. So, again, they knew that the laboratory had insufficient safety precautions, which is negligence. That they had no way of knowing how safe the labs were. It was regarding the level of the risk involved. That if you were conducting an experiment in a BSL-2 lab that was appropriate for a BSL-2 lab, there wouldn't have been a problem. That is the agreement. I don't understand. How is that consistent with B again? The distinction we were trying to make was there was a difference between actually creating the virus and the level of the risk involved, which is abnormally dangerous. Where does B say either of those? B doesn't talk about creation or experiments. It says they should have known there were serious biosafety problems. That's very generic. I don't know what kind of biosafety problems. Some kind of biosafety problems. And then 14C says there was no way of knowing how safe the labs were. And it doesn't say anything how safe they were with respect to experiments as opposed to creation as opposed to I don't know what. Well, it was creation versus the risks.  Does B and C distinguish between creation and something else?  Obviously, there is an inherent conflict between that. So resolve the conflict based on what's written in the complaint. I'm trying to. Not on what's not in the complaint. I'm being very clear, as clear as I can. The distinction was that the risky experiments applied to the creation of the virus. Okay. But you don't say that in the case. Well, I think the results. Is the judge's district judge supposed to intuit this? Well, it seems she didn't really even consider it. She conflated. I'm talking about the complaint now. Yes. Am I supposed to intuit that? Because I'm reviewing your complaint now. Tell me where I'm supposed to intuit that. I don't know. And I'm still not clear. Is B about creation? Is C about creation? Are they both supposedly about creation? C, there is a distinction. C is about creation. C is about creation. Okay. Tell me where in C I'm supposed to understand that's what you secretly meant. I don't think it was a secret. Okay. Tell me how I'm supposed to read C and understand that's what you meant. Okay. In the context of this complaint, in B and C, C is referring to the inherent risk, the abnormally dangerous activity, whereas B was referring to the lack of biosafety security. Well, no. C says how safe the laboratories were. You're saying there was some safety other than biosafety? Like earthquake safety? What are you talking about?  What we're saying is that creating an abnormally dangerous virus that has a level of risk that is ultra-hazardous, strict liability. Okay. Now you just lost me because we're talking. These are your allegations in your negligence section. You keep trying to pivot to strict liability, which is a separate part of your complaint. So I don't understand where you're going with that. Well, Your Honor, to be honest, I didn't write this complaint. We had hoped you would. Well, I'm not blaming you. Okay, fair enough. It's not your fault that it's unclear, but we are here for your client's complaint that the complaint should not have been dismissed. I am trying to understand what it possibly means in 14B and C, and I guess I'm suggesting to you that because those are part of the negligence allegations, I don't understand how your references to strict liability help me to understand the negligence allegations. I'm trying to explain the conflict and the confusion there. And I'm trying to explain to you how I don't understand how references to strict liability resolve that confusion. Excuse me? I don't understand how your references to strict liability help me to resolve the confusion about the negligence allegations. And I'm trying to explain to you that the conflict between B and C was actually a blending of the strict liability. That's what that was. Oh, so you're saying that B should have been under strict liability. Now, you said you didn't write this complaint. I find it interesting that you're the first person listed on the complaint. I'm not. You're seven. So perhaps are you thinking of a different complaint? You're Attorney Patricia Finn, correct? I am. I am the New York attorney. The author is Bruce Kipps, and he's very ill. But you signed on to this complaint. You may not have read it. Is that what you're doing? Your Honor, I read it. I read it like in my sleep. I read it all day long. I guess you didn't find those inconsistencies then. Let me ask you a different question. Your negligence complaint is that the defendants were negligent because they didn't adequately supervise the way the research was conducted in the lab, correct? That's your negligence complaint. As well as. Well, I'm talking about your negligence complaint. Your strict liability complaint is you shouldn't have been funding this research because it's inherently dangerous, and therefore you shouldn't have been funding it. One of the factors is whether considerable care, whether the risk could be avoided with considerable care. How do you, I'm asking you now about a different conflict, which I think is what, I don't presume what's going on in your head, but I think that's where you were trying to take Judge Nardini, but he wasn't asking about that conflict. I'm now asking about that conflict. How can on the one hand you say they were negligent by failing to adequately supervise, and on the other hand say they're strictly liable when in fact you allege they could have avoided the harm by using reasonable care? So creating an enhanced pathogen such as a gain-of-function virus is inherently dangerous. There is no way to do it safely. The negligence portion reviewed to the supervision and the release of the virus, that was allegedly concealed. So you have two separate theories here. You have strict liability that applies to the creation of an enhanced pathogen that is inherently dangerous. There is absolutely no reasonable steps that can be taken to prevent a harm caused by taking a virus and making it more infectious to humans, which is allegedly what the defendants did. The part two of the theory is the negligence, that once it was released, and I don't know if it was accidental or intentional, but we do know that it was released. There was negligence in disclosing to public health officials exactly what happened at Wuhan. There was quite a bit of concealment and misdirection, and this adversely affected the care and treatment of them. So you reserve some time for rebuttal. Yes. As I said earlier in the earlier case, we kept you well past your time. We'll hear from you again, and we'll hear from your friend on the other side, Mr. Olivo Castro. That's right, Your Honor. Good morning, and I may please the Court. My name is Juan Olivo. I was counsel to EcoHealth Alliance in the Fisher Court below, and I'm counsel to EcoHealth Alliance. Juan Olivo Castro. Juan Olivo? Yeah. I go by Juan Olivo. Juan Olivo Castro is also proper, Your Honor. Appellant's claims were appropriately dismissed. In her complaint, there were no sufficient allegations for a negligence claim nor sufficient allegations for a strict liability claim, at least no allegations that could survive a 12-B motion to dismiss. The pleading standards outlined in Iqbal and Twombly requires more than just a recital of the elements of a negligence claim or a strict liability claim. The claim must do more than allege the sheer possibility that the defendant has acted unlawfully. A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. I respectfully submit to the Court that none of that is present in the complaint at issue here in this appeal. And I want to focus first on negligence and the defects in the complaint as it relates to the negligence claim. A viable negligence claim requires a duty of care, a breach of that duty of care, actual cause, proximate cause, and damages. I submit to the Court that none of that is present in this case. And specifically, the appellant does not allege that EcoHealth had a specific duty of care running to Mr. Hurst. And by way of that, the appellant is relying on a general duty of care owed to the public at large in this case. It's the only duty of care that she could or that the plaintiff could articulate in this case that could carry a negligence claim. Because as I just mentioned, there's no allegations in this complaint that EcoHealth Alliance and Mr. Hurst, the decedent, had ever crossed paths in his life. So if we're relying on a general duty of care owed to the public at large, I would direct the Court to the decision in Hamilton v. Beretta, USA, Court. In that case, there was a second circuit. This Court certified two questions to the Court of Appeals. And just very quick background, that case, the defendants in those cases were gun manufacturers, distributors, and marketers of armed weapons. And the plaintiffs in those cases were either victims or families related to victims of armed robberies. And the two questions that were certified to the Court of Appeals by this Court, the second circuit, was, one, whether the defendants in that case owed the plaintiffs a duty of care, or, sorry, to exercise reasonable care in the marketing and distribution of the handguns that they manufactured. That question was answered in the negative. And that's the pertinent question I want to focus on from that case as it relates to this appeal. Because in determining whether or not there was a duty of care to be imposed on those manufacturers, in that case called fixing the duty point, that was the term used by the Court in that case, fixing the duty point, there were a list of factors that were considered. Those factors were, one, reasonable expectations of the parties and society, so not just the parties and society. Two, guarding against the proliferation of claims. Three, the likelihood of unlimited insurer-like liability, which we just discussed a little bit this morning. Another factor, the risk that there would be a disproportionate allocation of risk on a party. And perhaps the most important factor, foreseeability. And what's important to know about foreseeability, it's not there to define the duty of care, but it's there to circumscribe the scope of that duty. It tells us what the limit of that duty of care is. And I will get to it, but what I will submit to the Court is there's no explanation nor indication offered by the plaintiff in this case as to how we would circumscribe that duty of care. As far as I can tell, if there's a duty of care owed to Mr. Hurst, there would be a duty of care owed to the public at large. And finally, the last factor considered by the Court is the public policy concerns that are invoked by the notion of imposing a duty of care in a specific case. Let me ask you a question, and I'm not suggesting that the district court was incorrect at all. But hypothetically, if the district court was incorrect regarding whether the defendant owed a duty of care to plaintiff's husband, does plaintiff's negligence claim otherwise fail? Are there other reasons other than the duty of care? Yes, Your Honor. And one factor that would contribute to a dismissal of that negligence claim, even if there were a duty of care, would be legal causation or proximate cause. And I believe the Hamilton opinion, again, is a great guide for that analysis as well, because in that case they discussed the remoteness or take a step back. Any sort of negligence theory, specifically the legal causation component of that theory, will rely on a causal link, a link connecting, a link of misconduct, if you will, that connects the tortfeasor to the injured plaintiff, if you will. And in our case, just like in the Hamilton case, that causal link would be not only too long, but would also be too remote as it relates to EcoHealth, in our case, or the gun manufacturers in the Hamilton case. Because in Hamilton they're actually manufacturing the guns, but in EcoHealth the claim is a funding of a part of the work of the lab. That's right, Your Honor. Is that the claim? That's right, Your Honor. As explained earlier this morning, the complaint doesn't have any allegations that EcoHealth Alliance itself was directly involved in the experiments. Rather, the complaint uses the word funding throughout. There's 25 paragraphs in the complaint. None of them say that EcoHealth was directly involved in the experiments or in the research, just funding. And as you noted, the gun manufacturers in Hamilton were the manufacturers. They were involved in creating the guns. And in that case, the causal link was still found to be too remote. For instances that the court speculated on, for example, how did the guns make its way to the vicinity whereby they caused the unlawful conduct, i.e., where the robbery may have occurred, where the victim was shot? Those same questions persist here in our case. We don't know how Mr. Hurst got infected with COVID-19, where he got infected with COVID-19, what sort of precautions he observed. And all of those factors, all of those, yeah, all of those factors speak to how remote the causal link as it relates to EcoHealth is in this case. Would you turn then to the second issue of strict liability? Sure, Your Honor. Because I think that that's the elephant in the room, right? I would agree. Just like the negligence claim, Your Honor, I would submit that there is no plausible allegation that EcoHealth Alliance engaged in conduct that requires them to be held strictly liable. As my adversary pointed out earlier, there are six factors outlined in Dondakis that are borrowed from the second restatement. From 1965. So things may have changed, but go ahead. There's six factors. They tend to overlap with each other or at least go hand in hand, Your Honor. But if I could just focus on the third one, which was remarked on earlier, which is the inability to eliminate the risk. I think that that is what ultimately prevents this claim, amongst other issues with the complaint. But that is what ultimately prevents the strict liability claim from getting off the ground. There are allegations here that EcoHealth Alliance negligently funded the Wuhan sterile virology. That it also failed to adequately supervise what was going on at the Wuhan sterile virology. The court noted paragraph 14C, but there's also paragraph 15 that alleges no control. What we're talking about here in one instance is that EcoHealth failed to exercise reasonable care. But strict liability requires that there's no room for exercising reasonable care in the first place. That could have prevented the conduct from happening in the first place. So the two claims don't gel together given these allegations. And the other factors also support dismissal. Again, there's no allegation in the complaint that funding medical research poses a high degree or risk of harm. Or that the likelihood of funding medical research. Is there any circumstance under which funding scientific research could constitute an abnormally dangerous activity? I'm not aware of any authority, Your Honor. But I'm sure that some circumstance that I'm not aware of right now could exist or could arise in the future. That would fit into the strict liability factors that are normally reviewed. And that activity could be found strictly liable. That funding activity could be found strictly liable. But that's not this case. No, I appreciate that. That's your position. But you acknowledge that there could be a situation in which funding by itself of scientific or medical research might constitute an abnormally dangerous activity. Your Honor, I'm not aware of a scenario. Your friend here is. Go ahead. Yeah, I'm not aware of any scenario. What I'm leaving open for the possibility of is what the amicus brief was discussing. Which was preserving that the decision in this case won't foreclose what the amicus were discussing in their brief. And I do think, Your Honor, the activity of funding medical research, it's a long shot. That that sort of activity in of itself could be deemed something that could be held as strictly liable.  Having said that, I don't know. I just know that that's not here in this case. Okay. So we'll have to address it. Thank you. Ms. Finn. Thank you. Judge, let me just talk a little bit about Hamilton. Hamilton was a negligence case. That involved a legal product, a gun manufacturer. And it involved a criminal act where you had a bad guy take the gun and cause injury. That's not what happened here. And that does not apply to strict liability. What Judge Roushon did was she elevated or she conflated the policy arguments of Hamilton, confusing it with strict liability. Isn't the theory in gun cases that guns are inherently dangerous and, therefore, producing them and putting them into the stream of market causes liability? Isn't that the theory? No. In gun cases? No. No, because Hamilton actually said the opposite. Hamilton said that there was an attenuation, that there was an illegal act, and it was a negligence case. So there were intervening steps. Here on strict liability, we don't have that. So what Judge Roushon did, she conflated these policy issues from Hamilton with the strict liability and then enhanced that standard requiring operational control. Well, we don't know the extent of the operation because we got shut down before there was any discovery. Moreover, subsequent to the filing of this petition, which was a notice petition that did sufficiently, if you look at page 3, paragraph 12, it specifically talks about the gain-of-function research involving experimentation that is expected to increase transmissibility. I think it very clearly sets out what you were pointing out as being harm, although maybe not articulated clearly in 14 B and C. But I think, given the fact that Judge Roushon applied the wrong standard here, she gave them every favorable inference. She made determinations that this would chill scientific research, this limitless liability defense, which does not apply to sufficiency of pleadings. That's an affirmative defense, a policy issue that later comes at trial. Thank you. Thank you very much. Thank you. That was our decision.